UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
DORIS MCGARTY,

                Plaintiff,           **MEMORANDUM AND ORDER**

      - against -             12 Civ. 2813 (NRB)

THE CITY OF NEW YORK, JOSEPH
CARDIERI, General Counsel and
Deputy Commissioner of
Administration for Children's
Services of the City of New York,
and DIANE CONNOLLY, Assistant
Commissioner of Administration for
Children's Services of the City of
New York,

               Defendants.
----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

## I. Introduction

Plaintiff Doris McGarty ("plaintiff"), a 65-year-old attorney working for New York City's Administration for Children's Services ("ACS"), brings this action against the City of New York, ACS General Counsel Joseph Cardieri, and former ACS Assistant Commissioner Diane Connolly (collectively, "defendants") claiming that she was demoted and denied positions because of her age and retaliated against for complaining of discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 et

seq., and the New York City Human Rights Law ("NYCHRL"). Defendants move for summary judgment, asserting that no reasonable jury could find for plaintiff on any of her claims. For the reasons stated below, the Court grants defendants' motion for summary judgment as it relates to the ADEA and NYSHRL claims and dismisses without prejudice the NYCHRL claims.

## II. Background[1]

The following facts are undisputed except where otherwise noted.

### A. Initial Employment with the City: 1987-1998

In February 1987, plaintiff was hired by the City as an entry-level provisional staff attorney in the Family Law Division of ACS's predecessor agency, the Human Resources Administration. McGarty Decl. ¶ 2. In August 1988, she was promoted to the permanent civil service title of Attorney at Law Level 1. Pl. R. 56.1 ¶ 4. In March 1990, she was promoted again to the managerial rank of Associate General Counsel Level M-1. Id. ¶ 5. Because all managerial positions are

---

[1] The facts recited here are drawn from the following sources: (1) Defendants' Statement of Undisputed Facts Pursuant to Rule 56.1 ("Def. R. 56.1"); (2) the Declaration of Donald C. Sullivan ("Sullivan Decl.") and the exhibits annexed thereto; (3) the Reply Declaration of Donald C. Sullivan ("Sullivan Reply Decl.") and the exhibits annexed thereto; (4) the Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Br."); (5) the Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Def. Reply Br."); (6) Plaintiff's Response and Counterstatement Pursuant to Rule 56.1 ("Pl. R. 56.1"); (7) the Declaration of Charles B. Manuel, Jr. ("Manuel Decl.") and the exhibits annexed thereto; (8) the Declaration of Doris McGarty ("McGarty Decl."); and (9) Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp.").

provisional, plaintiff's underlying civil service title remained Attorney at Law Level 1 after she was promoted. McGarty Decl. ¶ 3. As Associate General Counsel, plaintiff performed a variety of legal, administrative, and supervisory duties, and provided critical assistance to the managers in charge of the family court units. Def. R. 56.1 ¶ 7; McGarty Decl. ¶¶ 44, 135, 136.

**B. Working Directly for Defendant Cardieri: 1998-2002**

In June 1998, defendant Joseph Cardieri became the Deputy General Counsel at ACS. Pl. R. 56.1 ¶ 16. Immediately after assuming that position, he interviewed and hired plaintiff, who was then 49 years old, to work directly for him. McGarty Decl. ¶¶ 23, 134; Sullivan Decl. Ex. B at 25. She functioned as his chief of staff -- although that was not her official title -- and served in that capacity for approximately four years, until August 2002. McGarty Decl. ¶ 134; Sullivan Decl. Ex. B at 25; Pl. R. 56.1 ¶¶ 9, 16.

Plaintiff's tenure working directly for Cardieri was marked by both positive and negative experiences. On the one hand, Cardieri occasionally praised plaintiff and showed his appreciation for her work. Pl. R. 56.1 ¶ 10. In addition, in April 2001, he promoted plaintiff to Executive Agency Counsel M-2 and gave her a raise. Id. ¶¶ 11, 12. Indeed, she described this period of time as being part of the "peak of [her] career." McGarty Decl. ¶ 139.

On the other hand, however, Cardieri repeatedly made comments to plaintiff about how she was "old guard" and that "we need more energy around here."[2]   Pl. R. 56.1 ¶ 17.   These comments began in 2000 and continued until she stopped working directly for Cardieri in 2002, at which point she no longer had contact with him.   Id. ¶¶ 17, 21.   Plaintiff testified that although her relationship with Cardieri was initially cordial, it deteriorated over time.   McGarty Decl. ¶¶ 144, 151.   Cardieri became more distant, stopped including plaintiff in important decisions, and began surrounding himself with younger staff.[3]   Id. ¶¶ 146, 151; Pl. R. 56.1 ¶ 20.   Plaintiff recounted specific actions Cardieri took which she found insulting, including: inviting other managing attorneys, but not her, to a tour of the Federal Reserve; telling her at a holiday party that he had presents for everyone except for her; and telling plaintiff at a time when her mother was sick that he was "tired of hearing about your sick mother."   Pl. R. 56.1 ¶ 23.

---

[2] Cardieri testified that plaintiff did not put much effort into her work, completed certain tasks slowly, and did not work long hours.   Manuel Decl. Tr. Ex. C1 at ECF 47-53.   Plaintiff disputes these assertions.   McGarty Decl. ¶¶ 197-98.

[3] Although Cardieri described plaintiff's work for him as "competent," he testified that he had to ask another staff member to take over her duty of checking notices of appeal because of an "embarrassing and substantively . . . huge" mistake she allegedly made.   Manuel Decl. Tr. Ex. C1 at ECF 22-25. Cardieri stated: "I was very disappointed, it also gave me a lot of pause as to can I keep her involved in complicated substantive work, do I trust her in that regard or do I need her doing other functions which have less of an impact."   Id. at ECF 29.   He further testified: "I ultimately saw it as a really bad mistake, I didn't think she was the most diligent of employees. . . . . [A]s a manager I had a responsibility to the agency and I dialed back on some of those responsibilities."   Id. at ECF 47.

**C. Transfer to the Fair Hearings Unit in 2002**

In August 2002, with no advance warning or explanation, Cardieri, who by then had become General Counsel, transferred plaintiff to the Fair Hearings Unit ("FHU"), a litigation unit within ACS.   McGarty Decl. ¶ 152.   Cardieri explained his decision to transfer plaintiff as follows:

> I remember [FHU] needed staff, and [plaintiff] was available.  I moved up to the General Counsel position and he had other administrative staff around him that I could rely on.  And they needed an attorney in the Fair Hearings Unit so I thought [plaintiff] can do whatever work they needed to do and be supervised closely in the Fair Hearings Unit, and she went there without a title reduction, without a salary reduction.

Manuel Decl. Tr. Ex. C1 at ECF 54.

Although Cardieri was in charge of FHU, he did not have any contact with plaintiff after she was transferred because she no longer reported directly to him.   Pl. R. 56.1 ¶ 29.   Plaintiff was unhappy about the transfer because it entailed a decrease in job responsibility.   Id. ¶ 26.   However, according to her resume and deposition testimony, she still supervised other attorneys and had substantial litigation duties.   Id. ¶¶ 27, 28; Sullivan Decl. Ex. K.

Plaintiff believed that her transfer to FHU was the result of Cardieri's alleged age bias.   Pl. R. 56.1 ¶¶ 23, 24.   Her belief was based on Cardieri's comments about the "old guard"

and need for more energy, the fact that Cardieri had not criticized her work, and Cardieri's increasing reliance on her younger coworkers. <u>Id.</u> ¶ 24.

**D. Transfer to the Accountability Review Panel in 2008**

In 2008, after approximately six years in FHU, plaintiff was transferred to the Accountability Review Panel ("ARP"), a nine-person unit within ACS that analyzes child fatalities and offers suggestions for systemic changes.[4]  Pl. R. 56.1 ¶¶ 37, 41, 42.  As with her previous transfer, she was not consulted ahead of time; she was simply told that she was being transferred. <u>Id.</u> ¶ 39.  She was unhappy with this approach, which she viewed as disrespectful.  <u>Id.</u>

Plaintiff was also unhappy with being placed in ARP. Although she described the unit as having "one of the most sensitive functions within any City agency," she perceived the transfer to be "a diminishment of [her] role in the agency." <u>Id.</u> ¶¶ 39, 40.  Defendant Diane Connolly, who took charge of ARP in February 2011, testified that ARP had two supervisors, Melanie Levin and Fredda Monn.  Sullivan Decl. Ex. O at 95. Plaintiff conceded that Levin and Monn were the unit supervisors.  Sullivan Decl. Ex. B at 51.  However, she testified that she acted as a supervisor on an "as-needed" basis

---

[4] Up until February 2011, ARP, like FHU, fell under Cardieri's jurisdiction. However, he had no contact with plaintiff when she worked in ARP because she did not report directly to him.  Pl. R. 56.1 ¶ 21; Def. R. 56.1 ¶ 37.

when asked by Monn to review reports written by others.  Id. at 51-52.  Monn echoed this testimony, stating that she gave plaintiff supervisory work.  Manuel Decl. Tr. Ex. D at ECF 39, 82.  Monn also testified that plaintiff performed this work very well.  Id.  In addition to reviewing reports written by others, plaintiff's duties at ARP included writing legal summaries and state fatality reports, interfacing with the Office of Children and Family Services, and presenting cases at ARP meetings. Sullivan Decl. Ex. B at 48-49, Ex. K.

**E. City Budget Crisis and Decision to Demote Plaintiff**

In 2010, the City was in the midst of a financial crisis which required ACS to reduce its operating budget by implementing programs to eliminate the gap ("PEGs") between expenses and revenue.[5]  Sullivan Decl. Ex. E ¶¶ 6, 7.  PEGs resulted in program cuts, staff demotions, reassignments, and layoffs at ACS and other City agencies.  Id. ¶¶ 7, 8.

In September 2010, Cardieri asked his Deputy General Counsel Martin Baron to make recommendations on how to achieve the $205,902 budget reduction goal -- or "PEG target" -- set for the General Counsel's Office.  Id. ¶¶ 9, 14, 15.  All ACS divisions received the following instructions regarding how they could achieve their assigned PEG targets:

---

[5] PEGs had been implemented at ACS several times in the years leading up to 2010.  Sullivan Decl. Ex. E ¶ 6; Sullivan Reply Decl. Ex. W-F; Manuel Decl. Tr. Ex. C1 at ECF 76, 87.

In order to allow for some flexibility in decision-making within each division, we are converting each division's target to a dollar amount and will be accepting the following items as 'credit' toward the target dollar amount.  We will forward the $ dollar amount target for your division shortly.

- Any clerical or secretary position currently filled by a permanent staff person

- Any pure provisional staff person

- Any demotion

- Removal of any item that is on the approved [sic] critical approved list

Julie will be sending your division's personnel sheets on Monday, we ask that you send us the names of staff you propose to layoff [sic] or demote in a spreadsheet by next Friday September 30th.  If you are doing a demotion, please specify the dollar amount the salary will be reduced to.

Sullivan Decl. Ex. E-1; see also Sullivan Decl. Ex. F at 72.

Consistent with these instructions, Baron proposed the following personnel actions to meet the $205,902 target: (1) allowing Robin Siskin, an attorney, to retire, netting a savings of $77,015;[6] (2) laying off Linda Speranza, a Principal Administrative Associate, saving $46,126; (3) laying off Shirley Williams, another Principal Administrative Associate, saving $57,357; and (4) laying off Vernell Webb, a secretary, saving

---

[6] According to Cardieri, he had to persuade the Finance Division to permit Siskin's retirement to count towards the $205,902 PEG target.  He testified: "Robin Siskin retired actually three months or so before her name appears on this list.  I had a big back and forth with our Finance Division who ultimately agreed that I can use the money even though she had already retired, I can use her 77,000 to put on my list in getting towards 200,000." Sullivan Decl. Ex. F at 73.

$35,285.[7]   Sullivan Decl. Ex. E ¶ 17.   These proposed actions
would have resulted in a total budget reduction of $215,783.

Cardieri approved Baron's proposal and submitted it to ACS
for implementation.   Id.   However, ACS's Personnel Division
informed Cardieri and Baron that the PEG proposal would need to
be revised since two of the employees slated for termination --
Williams and Speranza -- held civil service titles which
prevented them from being laid off under the PEG.[8]   Id. ¶ 18.
Consequently, Cardieri tasked Baron with finding another way to
meet the PEG target.   Id. ¶ 19.

To make up the approximately $100,000 savings that could no
longer be achieved by laying off Williams and Speranza, Baron
proposed laying off secretary Lencia Trotman, whose salary was
$53,031, and either laying off another clerical staff member[9] or
demoting plaintiff to her underlying civil service title, which,
according to Baron, would save the office $36,141.   Id. ¶¶ 20-
22.   Baron preferred the option of demoting plaintiff because he
believed it imposed the least damage to the General Counsel's
Office and prevented the need to lay off another employee.   Id.
¶ 23.   Baron also explained:

---

[7] Cardieri testified that he never mentioned targeting anyone and that "[i]t
never even came to [his] mind regarding putting [plaintiff] on the list."
Manuel Decl. Tr. Ex. C1 at ECF 73.
[8] According to Baron, the employee roster had erroneously listed Williams and
Speranza as not holding civil service titles.   Sullivan Decl. Ex. E ¶ 18.
[9] Cardieri testified that ACS's Business Law Division, where the clerical
staff member worked, was vehemently opposed to laying off that individual
because it would severely impact the division.   Sullivan Decl. Ex. F at 81.

> In evaluating alternatives, I considered whether
> there were other demotions that could take place
> and/or whether there were other employees who could
> be let go without adversely affecting the operations
> of the General Counsel's Office. Further, it was my
> understanding, based on discussions with other ACS
> staff, that [plaintiff] could perform similar
> functions to those she was then currently performing
> if she was returned to her underlying civil service
> title, and that [plaintiff] was not supervising
> anyone despite the fact that she had a managerial
> title.

Id. ¶ 21.

Cardieri testified that he tried to avoid having to either lay off another employee or demote plaintiff, but that ACS's Finance Division, having generously credited Robin Siskin's retirement towards the PEG target, demanded that the General Counsel's Office meet its target. Sullivan Decl. Ex. F at 80. Therefore, Cardieri selected the option of demoting plaintiff, and on October 5, 2010 he submitted a revised PEG proposal which included plaintiff's demotion from Executive Agency Counsel M-2 with a salary of $103,600 to Attorney at Law with a salary of $67,459.[10]  Sullivan Decl. Ex. E ¶¶ 23, 24.  Plaintiff claims that Cardieri chose to demote her because of her age.

Plaintiff was not the only manager demoted as a result of the budget crisis.  See Sullivan Reply Decl. Ex. W-K; Manuel Decl. Ex. 9.  Indeed, several managers at ACS were demoted for PEG purposes, some with substantial reductions in salary.  See,

---

[10] The proposal was still $4,430 short of the PEG target.  Sullivan Decl. Ex. E ¶ 22.

e.g., Manuel Decl. Ex. 9 (Howard Wexler demoted from Computer Systems Manager M-1 earning $93,625 to Computer Aide 2 earning $55,553). However, plaintiff asserts that she was the only attorney manager who was demoted for PEG purposes, and that even the attorney managers demoted for cause during this period did not receive salary and title reductions as great as those she received. McGarty Decl. ¶¶ 68, 69.

At the time Cardieri submitted his PEG proposal, forty-one employees in the General Counsel's Office (including plaintiff) held the title Attorney at Law, Agency Attorney, or Executive Agency Counsel. Def. R. 56.1 ¶ 85. Of those forty-one employees, ten were between the ages of 40 and 49 (including Cardieri, who was 46[11]), twelve were between the ages of 50 and 59, and eight were 60 or older. Id. ¶¶ 87, 88. Of the eight who were 60 or older, one (Baron) was 60, plaintiff and another person were 61, one was 62, one was 64, one was 70, and one was 80. Id. ¶ 89; Sullivan Decl. Ex. P ¶ 8.

**F. Plaintiff's Demotion**

After Cardieri submitted the PEG proposal for his office, it went through a lengthy administrative process involving several City agencies. Pl. R. 56.1 ¶¶ 90-92. As a result of this process, plaintiff's demotion did not actually take effect until March 14, 2011. Id. ¶ 104. In February 2011, however,

---

[11] See Sullivan Decl. Ex. P ¶ 6; McGarty Decl. ¶ 143; Def. Br. at 15.

plaintiff's unit, ARP, was transferred from the General Counsel's Office, which was led by Cardieri, to the Division of Quality Assurance ("DQA"), which was led by defendant Diane Connolly. <u>Id.</u> ¶ 95. Consequently, the individual who actually signed the paperwork officially demoting plaintiff in March 2011 was Connolly, not Cardieri.[12] <u>Id.</u> ¶ 94. Nonetheless, Cardieri and Connolly both testified that the budget savings associated with plaintiff's demotion were allocated to the General Counsel's Office rather than to DQA. Manuel Decl. Tr. Ex. C2 at ECF 21; Sullivan Decl. Ex. O at 64-65.

Significantly, before plaintiff's demotion took effect, Cardieri made efforts to help her. First, when one of plaintiff's supervisors, Fredda Monn, suggested that plaintiff's demotion could be avoided if another supervisor, Melanie Levin, was willing to work part-time, Cardieri supported the idea.[13] Def. R. 56.1 ¶ 100. Second, Cardieri emailed Gilbert Taylor, ACS's Deputy Commissioner of Family Court Legal Services, and asked if his division would hire her. Specifically, he wrote:

> How about this approach? I will reduce her from
> $103k to $68. She will be annoyed (of course, so
> would I). What if I tell her that she can speak to
> Margaret about pursuing a position in F.Ct. If you
> want her in Queens or somewhere else as an Attorney
> IV or higher – then she might get a bump to the IV

---

[12] Plaintiff contends that Connolly could have prevented her demotion but chose not to because of plaintiff's age. Sullivan Decl. Ex. B at 132-33. Notably, Connolly is older than plaintiff by approximately two years. Sullivan Decl. Ex. P ¶¶ 8, 9.

[13] Levin ultimately decided not to work part-time. Def. R. 56.1 ¶ 100.

> or higher line amount ($85-$90, or more).  If your
> area interviews her and you don't want to extend an
> offer, she stays where she is, or she can leave.
> How sound?

Sullivan Decl. Ex. T.[14]   Finally, in February 2011, Cardieri
scheduled a meeting with the Deputy Commissioner of DQA, the
Chief of Staff to the ACS Commissioner, and the Deputy
Commissioner for Finance to discuss possible ways to mitigate
the effects of the PEG on plaintiff.  Sullivan Decl. Ex. D, Ex.
G ¶¶ 7-12; Manuel Decl. Tr. Ex. C1 at ECF 83-84.  According to
one of the attendees: "Mr. Cardieri raised his concern that,
because of the PEG, [plaintiff] was scheduled to have a
significant salary reduction.  Mr. Cardieri asked us to discuss
whether, and if so, how, this reduction could be reduced or
eliminated.  Mr. Cardieri made it clear that he wanted to
protect [plaintiff's] salary, to the extent possible."[15]
Sullivan Decl. Ex. G ¶ 11.   Ultimately, all of Cardieri's
efforts to assist plaintiff proved unsuccessful.

Therefore, by letter dated February 25, 2011, plaintiff was
informed that, effective March 14, 2011, she would be demoted
from Executive Agency Counsel M-2 to Attorney at Law Level 1 --

---

[14] Taylor responded: "Joe- Just demote her and leave her where she is.  I
don't need a IV in Queens and would rather not have to deal with the
disgruntled resource.  You can keep her in your area making 68."  Sullivan
Decl. Ex. T.
[15] However, that attendee went on to state: "Ultimately, the consensus at the
meeting was that the salary reduction for [plaintiff] had to be implemented,
because the PEG had already been approved as part of a larger plan.  As such,
we believed any alternative would have necessitated eliminating another
position of approximately equal cost."  Sullivan Decl. Ex. G ¶ 12.

which ACS had determined was her underlying civil service title (Manuel Decl. Tr. Ex. E at ECF 68) -- and that her salary would be reduced to $67,459, which was approximately 35 percent less than what she had been earning.[16]   Sullivan Decl. Ex. H.   Fredda Monn, one of the supervisors in ARP, testified that right before plaintiff was notified of the demotion, Cardieri mentioned that plaintiff would probably quit and also stated that long-term service was not valued at ACS.[17]   Manuel Decl. Tr. Ex. D at ECF 66-68.

After receiving the demotion letter, plaintiff complained about her salary reduction to the Department of Citywide Administrative Services, which notified ACS that, pursuant to City policy, plaintiff's salary could not be reduced by more than 20 percent.   Def. R. 56.1 ¶¶ 105, 106.   According to Janet Subrizi, ACS's Assistant Commissioner of Personnel Services at the time, ACS had misinterpreted the City policy as allowing for

---

[16] In the midst of the layoffs and demotions during this time period, the General Counsel's Office hired Jennifer Feillman, an individual who was younger than plaintiff, as a Legal Audit and Integrity Specialist at an annual salary of approximately $100,000.   Pl. R. 56.1 ¶ 139; Manuel Decl. Ex. 23.   Critically, however: ACS identified the need for this specialized position in 2008 to combat fraud, which had cost the agency a substantial amount of money; according to Cardieri, ACS encumbered funds to hire for the position before the PEG at issue in this case even existed; and the position was approved because two employees had left ACS.   Sullivan Decl. Ex. F at 123-25, Ex. Q, Ex. R.

[17] Monn also testified in somewhat vague terms about other comments Cardieri made regarding plaintiff.   She stated that Cardieri brought up plaintiff's name at various meetings before 2008 in which division heads discussed who should be transferred or demoted, although she did not indicate exactly when or how often he did so.   Manuel Decl. Ex. D at ECF 64-66.   Further, she stated that she thought she recalled Cardieri asking, at a meeting in 2010 regarding the relocation of attorneys to a new building, why plaintiff should have her own office.   Id. at ECF 69-71.

salary reductions in excess of 20 percent when an employee, like plaintiff, had an underlying civil service title. Manuel Decl. Tr. Ex. F at ECF 15. Once ACS was notified of its error, it immediately changed her salary to $82,880 (exactly 20 percent less than her Executive Agency Counsel M-2 salary) and, because this salary exceeded the maximum salary allowed for an Attorney at Law Level 1, it changed her title to Attorney at Law Level 2.[18] Def. R. 56.1 ¶¶ 109, 110.

Although ACS had determined that plaintiff's underlying civil service title was Attorney at Law Level 1, there is some dispute as to whether this was accurate. ACS's payroll management system did not specify an attorney level designation for plaintiff. Manuel Decl. Tr. Ex. E at ECF 49; Pl. R. 56.1 ¶ 14. Plaintiff testified that her title was Attorney at Law Level 1, but she also testified and presented evidence that her title was reclassified in the 1990's to Attorney at Law Level 3. Pl. R. 56.1 ¶ 14. Regardless of her underlying civil service title, however, the evidence indicates that plaintiff could have been given any title whose salary range encompassed her salary. Manuel Decl. Tr. Ex. E at ECF 76. Although her initial demotion salary of $67,459 was too low for any title above Attorney at Law Level 1, her recalculated salary of $82,880 fell within the

---

[18] Because plaintiff was demoted to a non-managerial title, she also received $13,788 in longevity and recurring increment payments. Pl. R. 56.1 ¶ 112. Therefore, her total compensation was $96,668, which was $6,932 less than her previous salary of $103,600.

salary ranges associated with Attorney at Law Levels 2, 3, and 4 as well as salary ranges associated with management-level positions. Manuel Decl. Tr. Ex. 6b, Ex. E at ECF 70. Thus, once plaintiff's salary was adjusted to $82,880, it was at least theoretically possible for her to be given a higher title than Attorney at Law Level 2.

Plaintiff's title mattered because it determined what duties she could perform. Def. R. 56.1 ¶ 116. Although the responsibilities she was given after her demotion to Attorney at Law Level 2 were not very different from those she was given before her demotion, one important change was that she was no longer assigned cases where there was a history of family involvement with child welfare authorities.[19]  Id. ¶¶ 119-22, 125, 126; Manuel Decl. Tr. Ex. A1 at ECF 100.

**G. Events after Plaintiff's Demotion**

On April 14, 2011, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") charging age discrimination against Cardieri and ACS. Sullivan Decl. Ex. A ¶ 5.[20]  The EEOC notified ACS of this filing. Id. ¶ 96. More than three months later, in late July, plaintiff's unit moved locations and plaintiff was assigned to a cubicle, an act which

---

[19] Despite her demotion, plaintiff performed well in her new role and received praise for her work. Sullivan Decl. Ex. B at 209-10.
[20] Confusingly, the Amended Complaint provides two different dates for the EEOC filing. Paragraph 5 lists the date as April 14, 2011, whereas paragraph 96 lists it as March 10, 2011. See Sullivan Decl. Ex. A ¶¶ 5, 96. The date written on the actual filing, however, is April 14, 2011.

she believes was in retaliation for her filing the EEOC complaint. Pl. Opp. at 20-21; Manuel Decl. Tr. Ex. A2 at ECF 28. After years in an office, plaintiff was forced to work first in what she described as a "dark, dreary, rodent-infested" cubicle, and then in a different cubicle which was cramped and near a copying machine and water cooler. Id. Plaintiff testified that she asked Connolly, the head of DQA, for an office, but that Connolly responded: "Oh, no, you can't have an office. You're not a director."[21] Id. According to plaintiff, another unit constructed offices for its attorneys to avoid having them seated in cubicles. Id. at ECF 29.

## H. Positions for which Plaintiff was not Hired

Finally, plaintiff applied, but was not selected, for two positions which are relevant to the current litigation. First, in December 2010, plaintiff applied to be the Chief of Staff to the Deputy Commissioner of Family Court Legal Services.[22] Def. R. 56.1 ¶ 145. The job vacancy notice provided the following description of the position:

> Under the direction of the Deputy Commissioner for Family Court Legal Services (FCLS), with great latitude to exercise independent judgment, the Chief of Staff is responsible for assisting the Deputy Commissioner with the direction, administration and coordination of all FCLS units. Specific duties and responsibilities include:

---

[21] The record does not reveal whether any non-directors in plaintiff's unit were given an office.
[22] The Deputy Commissioner of Family Court Legal Services was Gilbert Taylor, whom Cardieri had previously emailed to ask about hiring plaintiff.

- Confer expert advice to the Deputy Commissioner on agency policy and external matters.

- Attend meetings on Deputy Commissioner's behalf, both at ACS and in the larger child welfare community.

- Play an active role in the planning and implementing of long and short term goals for FCLS.

- Assist in developing effective protocols and policies in accordance with community needs.

- Coordinate the work of FCLS with other ACS divisions and work with the child welfare community to meet demands.

- Provide strategic direction and advisement to the Permanency Law Steering Committee.

- Work with the Division of Quality Assurance and the Agency Program Assurance Unit to facilitate information flow between divisions.

- Work with agencies, attorneys and MIS concerning Permanency Hearing Report trainings, completion, submission, and quality improvement.

- Oversee FCLS personnel matters, such as recruitment and staff development.

- Respond to community and citizen correspondence and escalate emerging issues to the Deputy Commissioner.

- Provide operational support throughout the division, including managing the allocation of electronic and office equipment and supplies.

Sullivan Reply Decl. Ex. W-M.

Plaintiff was interviewed for the position, but she received poor evaluations from her two interviewers, Nancy Thomson and Cynthia Lopez. Sullivan Reply Decl. Ex. W-N.

Thomson noted on her evaluation form -- on which she rated plaintiff a 2 out of 5 -- that plaintiff had "limited involvement w/FCLS since 2004." Sullivan Reply Decl. Ex. W-N. Lopez, who rated plaintiff a 1 out of 5, noted, among other things: "Doesn't have the energy required of a Chief of Staff. Has been too removed from FCLS and doesn't understand how fundamental it is to work with other divisions." Id.

The interviewers ultimately selected a 32-year-old female applicant who had been working in the Family Court Legal Services unit for the past five years, most recently as an Assistant Supervising Attorney.[23]   Sullivan Decl. Ex. A ¶ 90; Sullivan Reply Decl. Ex. W-Q. Her resume indicated that she had been supervising a team of ten attorneys and assisting with the supervision of all attorneys in the unit. Sullivan Reply Decl. Ex. W-Q. By contrast, plaintiff's resume made no mention of her supervising anyone since 2007. Sullivan Decl. Ex. K.

---

[23] The record contains a single evaluation form for this applicant. See Sullivan Reply Decl. Ex. W-P. It is unsigned and does not reveal which of the interviewers prepared it. The evaluation includes several positive comments, such as: "seems to be a team player"; "has good energy"; "seems approachable"; "stated that she doesn't take things personal"; "practice giving clear and concise expectations to those that report to her"; "cares about her job and likes what she does"; "aspires to fill a leadership role in her future"; and "was able to clearly articulate One Year Home and IOC initiatives." Id.   The record also contains evaluation forms for two other applicants who were not selected. Notably, Lopez wrote on the evaluation form for one of these applicants -- who, based on the applicant's resume, appears to be several years younger than plaintiff -- "Has a lot of energy + knows when it should come out." Sullivan Reply Decl. Ex. W-O. Thomson wrote on the same applicant's evaluation form: "[E]nergetic but seems able to control it when necessary." Id.

Second, in February 2011, plaintiff applied to be the Chief of Staff to the incoming Deputy Commissioner of Family Support Services.  Pl. R. 56.1 ¶ 153.  The job vacancy notice described the position as follows:

> Under the direction of the Deputy Commissioner for Family Support Services, with great latitude to exercise independent judgment and decision-making, the Chief of Staff to the Deputy Commissioner is responsible for managing the Deputy Commissioner's Office.  Specific duties and responsibilities will include:
>
> - Attend meetings with and on behalf of the Deputy Commissioner.
>
> - Conduct appropriate follow up from meetings and issues that are raised with the Deputy Commissioner.
>
> - Provide assistance to the Deputy Commissioner in budget, contract, facilities, and personnel issues, including the application of administrative policies and regulations relating to program operations.
>
> - Work closely with the senior management team within Family Support Services to address and assist with key priorities and initiatives as well as specific policy and program areas within and outside of the division.
>
> - Work closely with the Commissioner's Office to prepare for meetings, provide information and act as liaison on certain projects.
>
> - Ensure the Deputy Commissioner is briefed and prepared for meetings.
>
> - Oversee the appropriate and timely responses of written correspondence and inquiries as directed/assigned to the Deputy Commissioner.
>
> - Draft memos and correspondence and review written material for the Deputy Commissioner.

- Work with contract agencies, other divisions, and external stakeholders on specific related issues.

- Review and assist in the updates and development of existing and/or new child welfare policies and procedures.

- Assess and work to resolve issues brought to the Deputy Commissioner's attention.

Sullivan Reply Decl. Ex. W-R.

Plaintiff was not selected for an interview and the position was ultimately given to a 42-year-old female applicant who, for the previous four years, had served as the Special Assistant to the prior Deputy Commissioner of Family Support Services. Sullivan Reply Decl. Exs. W-S, W-T. The applicant's responsibilities as Special Assistant overlapped extensively with those listed in the job description for the Chief of Staff position. Id. Moreover, she had seventeen years of child welfare experience and held a master's degree in social work from Columbia University. Id.

Lastly, plaintiff points out that in November 2011, her supervisor, Fredda Monn, was transferred out of ARP and replaced by a younger attorney. Def. R. 56.1 ¶ 159. Although plaintiff contends that she was qualified for Monn's job, she never applied. Manuel Decl. Tr. Ex. A2 at ECF 35. Her explanation was that she "didn't think [she] had a chance." Id.

## III. Discussion

### A. Standard of Review

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  "In assessing the record to determine whether there is [such] a genuine issue [of material fact] to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'"  F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of

material fact." Id. (citing Anderson, 477 U.S. at 249).   The
non-moving party "must do more than simply show that there is
some metaphysical doubt as to the material facts and may not
rely on conclusory allegations or unsubstantiated speculation."
Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d Cir. 2011)
(internal quotation marks and citations omitted).

The Second Circuit has "repeatedly emphasized 'the need for
caution about granting summary judgment to an employer in a
discrimination case where, as here, the merits turn on a dispute
as to the employer's intent.'"   Gorzynski, 596 F.3d at 101
(quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir.
2008)).   However, "[t]hough caution must be exercised in
granting summary judgment where intent is genuinely in issue,
summary judgment remains available to reject discrimination
claims in cases lacking genuine issues of material fact."
Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994)
(internal citation omitted).   Indeed, it is well established
that "summary judgment may be appropriate even in the fact-
intensive context of discrimination cases."   Abdu-Brisson v.
Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).   See
also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied,
474 U.S. 829 (1985) ("Indeed, the salutary purposes of summary
judgment -- avoiding protracted, expensive and harassing trials

-- apply no less to discrimination cases than to commercial or other areas of litigation.").

**B. ADEA Claims**

As a threshold matter, defendants argue that plaintiff's ADEA claims against Cardieri and Connolly must be dismissed because there is no individual liability under that statute.[24] Def. Br. at 25. Defendants are correct that "the ADEA precludes individual liability." Cherry v. Toussaint, 50 F. App'x 476, 477 (2d Cir. 2002). Therefore, defendants' motion for summary judgment is granted as to the ADEA claims asserted against Cardieri and Connolly individually.[25]

**1. Age Discrimination**

Plaintiff alleges that she was discriminated against on the basis of her age when she was demoted and when she was denied the two Chief of Staff positions to which she applied as well as the ARP supervisor position to which she did not. Pl. Opp. at 5-12. Claims of age discrimination under the ADEA are analyzed under the three-step burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as modified by Gross v. FBL Financial Services, 557 U.S. 167 (2009). See Mikinberg v. Bemis Co., 555 Fed. Appx. 34, 35 (2d

---

[24] Plaintiff does not address this issue in her opposition brief.
[25] "Unlike federal discrimination claims, claims under the NYSHRL and NYCHRL can be brought against individuals." Anyanwu v. City of New York, No. 10 Civ. 8498 (AJN)(THK), 2013 U.S. Dist. LEXIS 132138, at *28 (S.D.N.Y. Sept. 16, 2013).

Cir. 2014).   Under this framework, plaintiff must establish a
prima facie case of age discrimination by showing: "(1) that she
was within the protected age group, (2) that she was qualified
for the position, (3) that she experienced adverse employment
action, and (4) that such action occurred under circumstances
giving rise to an inference of discrimination." Gorzynski, 596
F.3d at 107.   If plaintiff is able to establish this prima facie
case, "the burden shifts to the defendant to articulate some
legitimate, nondiscriminatory reason for its action." Id. at
106 (internal quotation marks omitted).   "Once such a reason is
provided, the plaintiff can no longer rely on the prima facie
case, but may still prevail if she can show that the employer's
determination was in fact the result of discrimination." Id.

The final step of the analysis is where Gross becomes
relevant.   Before Gross, a plaintiff was required only to
present evidence sufficient for a jury to find that the adverse
employment action was motivated at least in part by her age.
Id. In Gross, however, the Supreme Court eliminated this mixed-
motive analysis and held that "a plaintiff bringing a disparate-
treatment claim pursuant to the ADEA must prove, by a
preponderance of the evidence, that age was the 'but-for' cause
of the challenged adverse employment action." Gross, 557 U.S.
at 180.   In other words, "the plaintiff must prove not only that
the proffered nondiscriminatory reason was pretextual but also

that the discrimination was the real reason." McDonald v. United States Postal Serv. Agency, 547 Fed. Appx. 23, 25 (2d Cir. 2013) (internal quotation marks omitted).

Rather than apply this framework formalistically, however, "court[s] may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action." Howard v. MTA Metro-North Commuter R.R., 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011).

### a. First Step: Prima Facie Case

Defendants do not dispute the first three elements of a prima facie case. However, they argue that plaintiff cannot satisfy the fourth element, namely that she was subject to an adverse employment action under circumstances giving rise to an inference of discrimination. See Def. Br. at 11. Given the minimal burden of establishing a prima facie case, see McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001), and our obligation to view the facts in the light most favorable to plaintiff, we assume, without holding, that plaintiff has satisfied this fourth element, at least with respect to her demotion and ACS's failure to hire her for the two Chief of Staff positions. See, e.g., Morris v. Ales Group USA, Inc., 04 CV 8239 (PAC)(THK), 2007 U.S. Dist. LEXIS 47674, at *19

(S.D.N.Y. June 28, 2007) ("Rather than apply the McDonnell Douglas test formalistically, the Court will assume that Morris has made out a prima facie case of discrimination on this claim."); Hamilton v. Mount Sinai Hosp., 528 F. Supp. 2d 431, 439-40 (S.D.N.Y. 2007) (listing cases in which the court assumed that plaintiff established a prima facie case of discrimination).   With respect to ACS's failure to hire plaintiff to replace Fredda Monn as ARP's supervisor, we conclude that she has not established a prima facie case because she chose not to apply for the position.   Brown v. Coach Stores, 163 F.3d 706, 710 (2d Cir. 1998) ("We read McDonnell Douglas and Burdine generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom . . . .").

We therefore proceed to the next step of the McDonnell Douglas analysis and consider whether defendants have provided legitimate, nondiscriminatory reasons for demoting her and for not hiring her for the Chief of Staff positions.

### b. Second Step: Legitimate, Nondiscriminatory Reasons

#### i. Plaintiff's Demotion

Defendants maintain that plaintiff was demoted in order to help meet the $205,902 PEG target for the General Counsel's Office.   Def. Br. at 19-20.   They further assert that those involved in the demotion decision, Cardieri and Baron, were not

looking to harm plaintiff, but rather viewed her demotion as the best way to reduce the budget without laying anyone else off or causing substantial disruption to the functioning of the agency. Defendants' burden here is merely "one of production, not persuasion." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000). Moreover, "[t]he court is not to pass judgment on the soundness or credibility of the reasons offered by defendants, so long as the reasons given are 'clear and specific.'" Schwartz v. York College, No. 06 Civ. 6754 (RRM)(LB), 2011 U.S. Dist. LEXIS 93495, at *21 (E.D.N.Y. Aug. 22, 2011) (quoting Mandell v. Cnty. of Suffolk, 316 F.3d 368, 381 (2d Cir. 2003)). Because defendants have adequately articulated a legitimate, nondiscriminatory rationale for plaintiff's demotion, we conclude that they have met their burden.

### ii. Failure to Hire Plaintiff as Chief of Staff

Similarly, defendants have provided a legitimate, nondiscriminatory reason for why plaintiff was not hired for the Chief of Staff positions: namely, that the chosen applicants had superior qualifications. Def. Br. at 21-22; Def. Reply Br. at 9. To meet their burden, defendants "need not prove that . . . [they] made the wisest choice, but only that the reasons for the decision were nondiscriminatory." Davis v. State Univ. of N.Y., 802 F.2d 638, 641 (2d Cir. 1986).

With respect to plaintiff's application to become Chief of Staff to the Deputy Commissioner of Family Court Legal Services, plaintiff's interview evaluation forms indicate that her limited involvement with the Family Court Legal Services Division, lack of energy, and failure to appreciate the importance of working with other divisions motivated the decision not to hire her. Moreover, unlike plaintiff, the applicant who was selected had worked in the Family Court Legal Services Division for the past five years and had substantial supervisory responsibility in her then-current position.   Thus, the evidence is consistent with defendants' nondiscriminatory rationale.

With respect to plaintiff's other Chief of Staff application, defendants have also submitted evidence consistent with their nondiscriminatory rationale.   The resume and cover letter of the individual who was ultimately selected reveal that she had significant and relevant credentials for the job. Indeed, for the previous four years, that applicant had been in the division serving as the Special Assistant to the Deputy Commissioner and had been performing many of the same duties as those expected of the Chief of Staff.   See Shortt v. Congregation KTI, No. 10 Civ. 2237 (ER), 2013 U.S. Dist. LEXIS 4094, at *33 (S.D.N.Y. Jan. 9, 2013) (finding a legitimate, non-discriminatory basis for hiring individual over plaintiff when that individual had "qualifications more suitable to the job");

29

Schwartz, 2011 U.S. Dist. LEXIS 93495, at *21 (finding a legitimate, non-discriminatory basis for hiring someone whose "previous work experience matched the demands of the position more closely than Plaintiff's").

Therefore, in sum, we find that defendants have articulated legitimate, nondiscriminatory reasons for demoting plaintiff and for not hiring her for the Chief of Staff positions. Accordingly, the evidentiary burden shifts back to plaintiff to demonstrate that these reasons are pretextual and that age bias is the true reason.   In order to satisfy this burden, plaintiff must offer "hard evidence, not conclusory supposition." Schanfield v. Sojitz Corp. of America, 663 F. Supp. 2d 305, 329 (S.D.N.Y. 2009).

### c. Third Step: Discrimination as the "But-For" Cause

#### i. Plaintiff's Demotion

At this final stage of the analysis, we examine whether plaintiff has produced evidence from which a rational jury could find that plaintiff was demoted not because of the PEG, but because of age discrimination by Cardieri and/or Connolly. First, plaintiff argues that the circumstances of her demotion — — specifically that she was the only person Cardieri demoted, her title was drastically reduced, her salary was initially cut by an impermissible 35 percent, and the ultimate savings

realized by her demotion were minor -- are suspicious. However, these circumstances do not suggest an improper motive.

Baron and Cardieri testified that they viewed plaintiff's demotion and $36,141 salary reduction as a way to close the budget gap without having to lay anyone else off, and that demoting her made sense because much of the work she was doing did not require a managerial title. They -- and ACS's Personnel Division -- were unaware that plaintiff's salary could not be reduced by more than 20 percent. When they were notified of their mistake in March 2011, they immediately corrected it. At that point -- five months after the PEG proposal had been submitted and less than two weeks before it was set to take effect -- Cardieri or Connolly might have been able to elevate plaintiff's title beyond Attorney at Law Level 2 since her corrected salary fell within the range for more senior positions. They might also have been able to convince the Finance Division to allow them to retract plaintiff's demotion, given that with her corrected salary and entitlement to longevity and recurring increment payments, her demotion only saved the agency about $7,000 per year. Their failure, or perhaps inability, to take such action resulted in the relegation of an attorney with twenty-four years of dedicated service at ACS to an entry-level position. As unfortunate -- and possibly undeserved -- as that result may have been,

however, plaintiff has not shown it to be the product of age discrimination.

Plaintiff contends that Cardieri's age bias is evident from the fact that when her demotion took effect, he hired an attorney who was younger than her to become a Legal Audit and Integrity Specialist at an annual salary of approximately $100,000. However, as explained in Part II.F, supra, this hiring is hardly proof of age discrimination. The attorney was hired not to replace plaintiff, but to perform a different and highly specialized function. Furthermore, ACS identified a need for the specialized position in 2008 to combat the costly problem of fraud at the agency. In addition, ACS encumbered funds to hire for the position before the PEG at issue in this case even existed. Finally, the position was approved only after two employees had left ACS.

Plaintiff further argues that Cardieri made several comments to and about her which reveal his discriminatory animus. First and foremost, she alleges that between 2000 and 2002, he repeatedly referred to her as being part of the "old guard" and expressed a desire for "more energy around here." Even if one could consider these statements to be age-related,[26] they are relatively benign. Brennan v. Metropolitan Opera

---

[26] Plaintiff herself did not consider the "more energy" comment to be age-related. She testified that "when he said 'more energy,' he just wanted things to happen more quickly." Manuel Decl. Tr. Ex. A1 at ECF 29.

Ass'n, 192 F.3d 310, 314-18 (2d Cir. 1999) (holding that there was no triable issue of fact concerning age discrimination under the ADEA when, among other things, plaintiff's supervisor "told her that he felt she lacked energy"); Fortier v. Ameritech Mobile Comms., Inc., 161 F.3d 1106, 1113 (7th Cir. 1998) (supervisor's statements that it was time for "new blood" and that plaintiff's younger replacement "had a lot of energy" did not raise genuine issue regarding whether plaintiff's termination was motivated by age discrimination); Kelly v. Signet Star Re, LLC, 971 F. Supp. 2d 237, 251 (D. Conn. 2013) (holding that comments "concerning Plaintiff's lack of energy and the need for employees to have fire in their bellies" did not indicate age-based animus); Bobo v. Wachovia Sec. L.L.C., No. 07 Civ. 01056 (LEK)(RFT), 2010 U.S. Dist. LEXIS 27378, at *18 (N.D.N.Y. Mar. 23, 2010) ("[T]he 'old guard' reference does not give rise to an issue of material fact that would allow a reasonable fact finder to conclude Defendant intentionally discriminated against Plaintiff because of his age."). Even more importantly, the statements were made more than eight years before Cardieri decided to demote plaintiff. Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 150 (2d Cir. 2010) (holding that discriminatory comments which were "made years before most of the events at issue" and "were unrelated to the decision-making process" had "little probative value").

The only instances in the record of Cardieri making negative comments about plaintiff after 2002 were when he mentioned plaintiff's name for possible transfer or demotion, asked why she should get an office, predicted that she would probably quit after learning of her demotion, and remarked that long-term service was not valued at ACS.  None of these are probative of age bias.  Although long-term service may correlate with age, Cardieri's comment about it was not discriminatory. Indeed, saying that long-term service is not valued is different from saying that it is disfavored.

Thus, plaintiff offers scant evidence to support her claim that Cardieri demoted her because of her age.  In fact, there is substantial evidence undermining that claim.  First, it was not Cardieri, but his 60-year-old Deputy General Counsel Martin Baron, who suggested the demotion in the first place.  Second, that suggestion came only after an original PEG proposal was rejected by ACS's Financial Division.  Third, although there were opportunities for Cardieri to demote plaintiff as part of prior years' PEGs, Cardieri chose not to do so.  Fourth, plaintiff was far from the oldest attorney in the General Counsel's Office when she was demoted.  Indeed, there were five others who were plaintiff's age or older, including one who was 80.  Finally, Cardieri made several attempts to either prevent plaintiff's demotion or ameliorate its impact on her.

As weak as the evidence of age bias is against Cardieri, it is even weaker against Connolly. Connolly, who is older than plaintiff, is not alleged to have said anything even remotely age-related to or about plaintiff. Her only involvement in the demotion was to sign off on the decision Cardieri had made when plaintiff's unit was still under his jurisdiction.

Therefore, in sum, we find that plaintiff has not carried her burden of showing that age was the "but-for" cause of her demotion.

### ii. Failure to Hire Plaintiff as Chief of Staff

Plaintiff has similarly failed to demonstrate that age was the "but-for" cause of her being rejected for the Chief of Staff positions. As an initial matter, she has not shown that Cardieri or Connolly was in any way involved in the hiring decisions for those positions. To the extent that word of plaintiff's pending demotion may have leaked throughout the agency and doomed her applications, we cannot conclude that this was discriminatory since she has not demonstrated that the demotion itself was discriminatory. Although Cardieri had emailed Gilbert Taylor, one of the Deputy Commissioners to whom plaintiff had sought to become Chief of Staff, to ask if his division was interested in hiring her after her demotion, there is no reason to believe that this email sabotaged her application or, if it did, that age was the reason. The email

35

did not prevent her from being chosen for an interview, and the low ratings and negative comments she received from the interviewers do not appear to be based on anything other than her work experience and interview performance.

Further, plaintiff offers insufficient evidence upon which to conclude that those who were involved in the hiring decisions rejected her because of her age.   The evidence she offers consists of: (1) comments on the evaluation forms regarding her and other applicants' "energy," (2) defendants' failure to produce the evaluation forms for Fredda Monn, who, at approximately 50 years old, applied and was rejected for one of the Chief of Staff positions, and (3) plaintiff's credentials, which she contends "made her clearly the best candidate as compared to the much younger, less experienced candidates." Pl. Opp. at 15.

First, the comments on the evaluation forms -- that plaintiff "[d]oesn't have the energy required of a Chief of Staff" while one younger applicant was "energetic" and had "a lot of energy" and another had "good energy" -- are not necessarily discriminatory.   "Courts have generally held that remarks about an employee's 'energy level' do not indicate age-based animus, as an employee's level of energy -- or lack thereof -- is a legitimate business concern." Koestner v. Derby Cellular Prods., 518 F. Supp. 2d 397, 401 (D. Conn. 2007)

36

(internal quotation marks omitted).  Indeed, energy level is an important, job-related attribute that can be possessed by people of all ages and assessed in an interview.  Although the term "energy" could be used as a euphemism for age, there is no indication that it was used in such a way here, other than the fact that plaintiff was the only applicant found to be lacking it.[27]  To conclude that the comments about energy were actually coded references to age would require the Court to engage in impermissible speculation.

Second, plaintiff notes that the only applicant interviewed for the Family Court Legal Services position whose evaluation forms were not produced was Fredda Monn.[28]  This has caused plaintiff to believe that Monn's evaluations "probably contain[] references to 'lack of energy' or other derogatory age-based code words."  See Pl.'s July 18, 2014 Letter (ECF No. 45) at 2.  On September 9, 2014, the Court requested and received from defense counsel a copy of these evaluations for in camera inspection.[29]  The Court has reviewed the evaluations and they do not mention "energy" or any age-based code words.  Rather, they

_____

[27] Critically, the interviewers did not necessarily regard being energetic as a purely positive attribute.  Nancy Thomson's evaluation form for an applicant who was not selected included the comment: "[E]nergetic but seems able to control it when necessary."  Sullivan Reply Decl. Ex. W-O.

[28] Defendants argue that plaintiff never requested these forms during discovery.

[29] On September 16, 2014, with defendants' consent, the Court forwarded the evaluation forms to plaintiff's counsel.

contain only nondiscriminatory comments about Monn's work experience and interview performance.

Therefore, plaintiff's failure-to-hire claim hinges on her credentials, which she argues were far better than those of the applicants who were selected over her.  The Second Circuit has held that where a plaintiff seeks to prove discriminatory motive through a discrepancy in credentials, she faces a "weighty" burden.  Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001).  "[P]laintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  Id. (internal quotation marks omitted).  Although plaintiff had extensive legal and managerial experience at ACS, we cannot say that she was more qualified than -- much less "so superior" to -- the candidates who were ultimately selected for the Chief of Staff positions.  As the Second Circuit stated in Byrnie, we "must respect the employer's unfettered discretion to choose among qualified candidates."  Byrnie, 243 F.3d at 103 (internal quotation marks omitted).

Therefore, in conclusion, no reasonable jury could find, based on the permissible inferences to be drawn from the evidence above, that plaintiff's age was the reason she was not

hired for the Chief of Staff positions.  Accordingly, the Court finds that plaintiff has failed to raise a genuine issue of fact as to her ADEA discrimination claim and grants defendants' motion for summary judgment on that claim.

### 2. Retaliation

Plaintiff alleges that her placement in a cubicle in late July 2011 was retaliation for her filing a complaint with the EEOC on April 14, 2011.  Pl. Opp. at 20-21.  ADEA retaliation claims are analyzed under the McDonnell Douglas burden-shifting framework discussed in Part III.B.1, supra.  Gorzynski, 596 F.3d at 110.  Under this framework, the plaintiff carries the initial burden of establishing a prima facie case of retaliation.  To establish a prima facie case, "a plaintiff must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 129 (2d Cir. 2012) (internal quotation marks omitted).

"If the plaintiff meets this initial burden, the defendant must point to evidence of a legitimate, non-retaliatory reason for the challenged action." Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 973 F. Supp. 2d 386, 408 (S.D.N.Y. 2013).  "If the defendant meets its burden, then the plaintiff must point to

evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Id. (internal quotation marks omitted).   As with a discrimination claim, a plaintiff must establish that retaliation was the "but-for" cause of the adverse treatment.   See Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013).

### a. First Step: Prima Facie Case

In order to establish her prima facie case, plaintiff must demonstrate a causal connection between her April 14, 2011 EEOC complaint and her placement in a cubicle in late July 2011.   A causal connection can be demonstrated either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . ; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).   Here, plaintiff offers no evidence of retaliatory animus by Connolly or any other supervisor in her unit.[30]   Thus, her claim rests on the temporal proximity between her EEOC complaint and her assignment to a cubicle.

Although the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is

---

[30] Notably, when asked at her deposition whether she was retaliated against, she made no mention of the cubicle.   Manuel Decl. Tr. Ex. A2 at ECF 40.   In fact, she conceded, "I can't honestly answer that." Id.

too attenuated to establish a causal relationship," <u>Espinal v. Goord</u>, 558 F.3d 119, 129 (2d Cir. 2009) (internal quotation marks omitted), "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." <u>Murray v. Visiting Nurse Servs.</u>, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases). Over three months passed between plaintiff's EEOC complaint and her placement in a cubicle. Under these circumstances, we decline to find any inference of causation. We therefore grant defendants' motion for summary judgment on plaintiff's ADEA retaliation claim.

**C. NYSHRL and NYCHRL Claims**

As there is no longer any federal claim in this action, it is within the Court's discretion to exercise supplemental jurisdiction over plaintiff's remaining state and municipal law claims. <u>Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.</u>, 464 F.3d 255, 262-63 (2d Cir. 2006). By virtue of resolving plaintiff's ADEA claims, the Court has in fact resolved her NYSHRL claims as well. That is because the substantive standards for liability under the NYSHRL and ADEA are coextensive. <u>See</u> <u>Gonzalez v. Carestream Health, Inc.</u>, 520 Fed. Appx. 8, 10 n.1 (2d Cir. 2013) ("The elements of an age discrimination claim are essentially the same under the ADEA and

the NYSHRL, and courts apply the same standards for analyzing age discrimination claims under both statutes."); <u>Galanis v. Harmonie Club of N.Y.</u>, No. 13 Civ. 4344 (LTS)(AJP), 2014 U.S. Dist. LEXIS 3001, at *12-13 (S.D.N.Y. Jan. 10, 2014) ("[R]etaliation claims under the NYSHRL are analyzed under the same standard as claims brought under the ADEA.").[31]

Because the ADEA and the NYSHRL claims here "arise from the same set of operative facts and because the same legal standards apply to both, requiring Defendants to re-litigate [the NYSHRL] claims in state court would be neither fair nor convenient, nor would it serve the interest of judicial economy." <u>Vuona v. Merrill Lynch & Co.</u>, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013). We therefore exercise supplemental jurisdiction over plaintiff's NYSHRL claims and grant summary judgment to defendants on those claims.

However, a more liberal standard applies to claims brought under the NYCHRL, <u>Mihalik v. Credit Agricole Cheuvreux N. Am.</u>,

---

[31] Although an open question exists as to whether the "but-for" standard articulated in <u>Gross</u> also applies to claims brought under the NYSHRL, <u>Mikinberg v. Bemis Co., Inc.</u>, 555 F. App'x 34, 35 (2d Cir. 2014), the Second Circuit has assumed that it does. <u>See Gorzynski</u>, 596 F.3d at 106 n.6 ("The law governing ADEA claims has been held to be identical to that governing claims made under the NYHRL. Accordingly, we assume, without deciding, that the Supreme Court's <u>Gross</u> decision affects the scope of the NYHRL law as well as the ADEA." (internal citation omitted)). Also, while "[i]t is not yet clear whether the 'but-for' standard . . . applies to retaliation claims brought under the [NY]SHRL," <u>Hagan v. City of New York</u>, No. 13 Civ. 1108 (JPO), 2014 U.S. Dist. LEXIS 113847, at *44 n.13 (S.D.N.Y. Aug. 15, 2014), given that this standard only arises in the final step of the <u>McDonnell Douglas</u> analysis and plaintiff's retaliation claim failed in the first step, the question of whether this standard applies to NYSHRL claims is irrelevant in this case.

Inc., 715 F.3d 102, 109 (2d Cir. 2013), one with "which the [New York] state courts are more familiar." Vuona, 919 F. Supp. 2d at 394.   Consequently, we decline to exercise supplemental jurisdiction over plaintiff's NYCHRL claims and we dismiss them without prejudice.   The extensive discovery already taken is likely sufficient to enable these claims to be evaluated in state court without any additional discovery, see Murray v. Visiting Nurse Servs., 528 F. Supp. 2d 257, 280-81 (S.D.N.Y. 2007) (collecting cases), and plaintiff would not be prejudiced by dismissal since "New York's C.P.L.R. § 205 allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations."   Trinidad v. NYC Dep't of Corrs., 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006) (internal alterations omitted).

### Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment as it relates to plaintiff's ADEA and NYSHRL claims and dismisses without prejudice her NYCHRL claims.

Dated:   New York, New York
         September 16, 2014

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorney for Plaintiff**
Charles B. Manuel, Jr., Esq.
Manuel & Associates, LLP
One Penn Plaza, Suite 2527
New York, NY 10119

**Attorney for Defendants**
Donald C. Sullivan, Esq.
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007